[Civ. No. 46248. Second Dist., Div. Four. Dec. 24, 1975.]

JOHN F. COSTELLO et al., Plaintiffs and Respondents, v.
CITY OF LOS ANGELES, Defendant and Appellant.

**COUNSEL**

Burt Pines, City Attorney, Claude E. Hilker, Assistant City Attorney, and Henry G. Morris, Deputy City Attorney, for Defendant and Appellant.

John F. Costello and Frank Maggio, in pro. per., for Plaintiffs and Respondents.

**OPINION**

**KINGSLEY, Acting P. J.**—This is an appeal from a judgment holding void the assessments on three pieces of property within an assessment

district created by the City of Los Angeles under the Street Improvement Act of 1911 (Sts. & Hy. Code, §§ 5000-6794).

I

On the merits, the case involves the question of whether the method used to spread the assessments for a work of street improvement resulted in an over-assessment of the three lots herein involved. The trial court held that it did; we agree.

On October 10, 1967, the Los Angeles City Council adopted an ordinance providing for the improvement of Aqua Vista Avenue, in that city, between Fair Avenue and Vineland Avenue "in accordance with the Improvement Act of 1911." The work involved the widening of Aqua Vista Avenue to a uniform width of 46 feet. The total cost of the improvement was $49,554.53. All of the property within the assessment district was zoned for multiple residential housing. The properties lying on the north side of Aqua Vista Avenue are relatively short, running from 132 to 232 feet in depth. The lots on the south side of the street are substantially longer, running from the street back to a curving flood control channel; those herein involved vary from 230 feet to 549 feet.

Of the 38 lots involved, three had no access to Aqua Vista Avenue and were not assessed; one belonged to the city and was not assessed; four were what Mr. Farias (the city official who had spread the assessments) referred to as "flag" lots[1] and were assessed at a low rate. No objection was made in the trial court, or here, to the special treatment given to those eight lots.[2]

The contention made below, and here, is that the method used by Mr. Farias in spreading the assessments among the remaining 30 lots resulted in an overassessment of the lots on the north side of Aqua Vista with a resulting under-assessment of the lots on the south side of Aqua Vista and that that differentiation rested on no valid distinction and was arbitrary and void. After that contention had unsuccessfully been urged

[1]"There are certain lots within this particular district that have what we call flag lot considerations being given to them. That is, they may have, say a 10 or 15-foot frontage leading to a large parcel in the back. This again is a factor that is taken into account."

[2]The construction of the widened street had involved taking three feet from the front of each lot. Some of the lot owners had dedicated that area to the city for that purpose, others had not, resulting in condemnation of the three-foot strip by the city. A minor adjustment in the assessments was made to adjust the difference. No objection to that adjustment is here made.

on the city council, the present action was brought, resulting in a judgment in favor of plaintiffs. The city has appealed.

The theory underlying the differentiation was expressed by Mr. Farias as follows: "In this particular project the lots in the south side of the street are exceedingly deep. Therefore, the distance that must be traveled on site within those lots is considerable. And any improvements that are made within that lot such as driveways or approaches to the street are—have an offsetting factor in terms of benefit. The further you get away from it—in other words, the further you get away from the improvement the more negligible the benefit from that improvement becomes. [¶] So in this particular case we felt that those lots on the south side, although they are larger, the amount of benefit they derived was negligible, I believe, in terms of size simply because they have to travel so far to get to it. That means that on the site itself they would have to improve the particular property by the construction of driveways for the accessibility to the improvement and to the parking sites. [¶] These are considerations that were taken into account." Mr. Farias then explained that he had determined that no benefit would accrue to a lot with reference to any depth beyond 135 feet and that he had not, in spreading the assessments, taken into account any depth beyond that point, but that he had made an adjustment for lots having a depth less than 135 feet.[3]

We can find nothing in the record to support the method used by Mr. Farias. All that we are told in support of the arbitrary 135-foot "norm" is that it was based on "our experience and our best judgment" and that it was based, in some unexplained way, on a procedure adopted many years before by a predecessor of Mr. Farias. Nothing could be more arbitrary. Put in simpler words, a city official picks, out of thin air, a depth figure that he thinks is fair and, on that hunch, assesses the property of the lot owners.

Nor can we find in the record any factual basis for the assumption, above quoted, that the lots greater in depth would have no benefit beyond the 135-foot line (assuming any support for that line as against, say, 100 or 200 feet). We do not know, and nothing in the record shows that Mr. Farias knew, the potential cost per foot of a driveway nor how

---

[3] "We arrive at—based on our experience and our best judgment we arrive at a factor for every assessment district. We say that within a particular assessment district the norm for that district will be a hundred feet or a hundred and fifty feet or a hundred and thirty-five, whatever we determine it to be based on, like I say, our experience. Thereafter that is used as a basis to allow for certain credits which would be given to those particular assessments."

that compared with the benefit to be derived from the wider street. We do not know, and nothing in the record shows that Mr. Farias knew, that the owner of a lot with a depth over 135 feet would, necessarily, erect his apartment house on the front of the lot, with parking in the rear, thus narrowing, by the width of a driveway, the available frontage of his building. The owner may, equally as well, decide to avail himself of as much width as the building code allows, and place his apartment house to the rear of his lot, with parking facilities in front. Nothing is shown by this record to make either choice a certain, or even a more probable one.

In short, the differentiation on the basis of lot depth was arbitrary, an abuse of discretion and the trial court properly so found.

II

Furthermore, the method adopted by Mr. Farias amounted to a change in the size and boundaries of the assessment district. The ordinance creating the district included within the district thus established all of the lots included within "River View Tract" lying between Fair Avenue on the west and Vineland Avenue on the east. The method adopted by Mr. Farias resulted in drawing a different set of boundaries; the district over which he spread the assessments did not include all of the lots within the district established by the council, but only a smaller district, consisting of those portions of the lots lying within 135 feet on each side of Aqua Vista Street. The effect was to exclude from the council-established district up to 97 feet in depth of some of the lots on the north side of Aqua Vista and up to 414 feet in depth of some of the lots on the south side of that street. The statutes give to the assessing authorities no such power to amend the council-established district boundaries.

III

■ The case also presents some procedural problems. It was filed as a class action with three named plaintiffs, none of whom was or is a member of the California Bar, all three appearing in propria persona. The trial court, properly, refused to treat the case as a class action and it was tried as a suit by the three plaintiffs seeking relief for themselves alone. One of the named plaintiffs failed to appear at the trial and judgment went against him by default. No contention is made in this court that the case was a proper class action.

The action was brought against the city as the only other party. None of the owners of the other lots were joined, either as parties plaintiff or defendant. If the assessments on the lots belonging to the two plaintiffs are to be reduced, that reduction must be made up from some source, either by increasing the assessments on the lots lying on the south side of Aqua Vista Avenue (whose owners are not parties to this action) or by assumption of the over-assessment by the city.

The answer to those problems is found in sections 5500 through 5511 of the Streets and Highways Code (part of the Improvement Act of 1911). Under those sections, where a court has found an original assessment to be void, there must be a reassessment, cancelling the original assessment, with recall and replacement of any bonds theretofore issued based on the original assessment. Nearly the same situation existed in *Harrison* v. *Board of Supervisors* (1975) 44 Cal.App.3d 852, 863-865 [118 Cal.Rptr. 828]. (See also: *Cowart* v. *Union Paving Co.* (1932) 216 Cal. 375 [14 P.2d 764, 83 A.L.R. 1185]; *Riverdale etc. Dist.* v. *Shimmin* (1914) 24 Cal.App. 595 [141 P. 1070]; *Brenkwitz* v. *City of Santa Cruz* (1969) 272 Cal.App.2d 812, 816-817 [77 Cal.Rptr. 705].)

The trial court properly directed, in paragraph 4 of its judgment, that the city make "a re-assessment in accord with the manner and form provided by law, to cover the assessments decreed void by this judgment."

The judgment is affirmed.

Dunn, J., and Jefferson, J., concurred.